UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOLTEC INTERNATIONAL,
HOLTEC INDIAN POINT 2, LLC,
HOLTEC INDIAN POINT 3, LLC, *and*
HOLTEC DECOMMISSIONING
INTERNATIONAL, LLC,

                        *Plaintiffs*,

    v.

THE STATE OF NEW YORK,

                        *Defendant*.

No. 24-CV-2929 (KMK)

<u>ORDER & OPINION</u>

---

<u>Appearances</u>:

James M. Catterson, Esq.
Pillsbury Winthrop Shaw Pittman LLP
New York, NY
*Counsel for Plaintiffs*

Jay Eliot Silberg, Esq.
Anne Renee Leidich, Esq.
Pillsbury Winthrop Shaw Pittman LLP
Washington, DC
*Counsel for Plaintiffs*

Channing R. Wistar-Jones, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

      Holtec International, Holtec Indian Point 2, LLC ("HIP 2"), Holtec Indian Point 3, LLC

("HIP 3"), and Holtec Decommissioning International, LLC ("HDI"), (collectively, "Holtec" or

"Plaintiff") bring this Action against the State of New York ("New York" or "Defendant"),

alleging that New York Environmental Conservation Law ("ECL") § 30-0103 (the "Discharge

Statute" or "Statute") is federally preempted and seeking a declaratory judgment to that effect. (*See generally* Compl. (Dkt. No. 1).)  Before the Court is Holtec's Motion and New York's Cross-Motion, both for summary judgment.  For the reasons discussed below, Holtec's Motion is granted and New York's Cross-Motion is denied.

I.  Background

A.  Factual Background

 The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, (*see* Holtec's 56.1 Statement ("Pl's 56.1") (Dkt. No. 32); New York's 56.1 Statement ("Def's 56.1") (Dkt. No. 36); Holtec's 56.1 Response Statement ("Pl's 56.1 Resp.") (Dkt. No. 39); New York's 56.1 Response Statement ("Def's 56.1 Resp.") (Dkt. No. 36); Holtec's 56.1 Statement of Additional Material Facts (Dkt. No. 39); New York's Response to Holtec's Statement of Additional Materials Facts (Dkt. No. 42), as well as admissible record evidence. The facts as described below are undisputed unless otherwise noted.

 1.  Indian Point

 Indian Point Energy Center ("Indian Point") is a power plant consisting of three nuclear reactor units, Indian Point 1, Indian Point 2, and Indian Point 3, located in Buchanan, New York. (Pl's 56.1 ¶ 1.)  Indian Point was constructed and initially operated by Consolidated Edison Co. of New York, Inc. ("ConEd").  (*Id.* ¶ 4.)  ConEd received operating licenses for Indian Point 1 in 1962, for Indian Point 2 in 1973, and for Indian Point 3 in 1975.  (*Id.*)  The three reactors were permanently shut down in 1974, 2020, and 2021, respectively.  (*Id.* ¶ 5.)  On November 23, 2020, Holtec received approval from the U.S. Nuclear Regulatory Commission ("NRC") to assume ownership and operation of Indian Point, including responsibility for decommissioning. (*Id.* ¶ 7.)  Holtec is currently in the process of decommissioning Indian Point, which involves

disposing of structures and water, which contains radioactive materials left over from power plant operations and the storage of spent nuclear fuel. (*Id.* ¶¶ 23–24.) Even after treatment to remove radioactive materials, the water still contains tritium, a radioactive isotope of hydrogen that cannot be removed practically. (*Id.* ¶ 25.) Indian Point has been designed to release radioactive liquids into the Hudson River, a process that is in compliance with its NRC licenses. (*Id.* ¶ 26.)[1] Throughout the operation of Indian Point, millions of gallons of water containing tritium have been discharged into the Hudson River. (*Id.* ¶ 28.) In the course of decommissioning Indian Point, Holtec plans to treat and dispose of tritiated water in compliance with applicable NRC licenses and regulations. (*Id.* ¶ 29.) The radiation exposure from the discharge of liquid effluents from Indian Point is estimated at approximately one-thousandth of the twenty-five millirem safety limit. (Def's 56.1 ¶ 8.)

### 2. New York State Legislation

On February 24, 2023, New York State Senator Peter Harckham introduced a bill, S5181, to amend the ECL. (Pl's 56.1 ¶ 30; Decl. of James M. Catterson ("Catterson Decl."), Ex. A ("S5181") (Dkt No. 30-1).) The Parties dispute whether S5181 "ultimately became" the

---

[1] New York disputes this fact, asserting that: "While NRC may have approved [Indian Point's] design, there is no claim by Holtec or evidence that NRC has approved Holtec's discharges to the Hudson River. Complaint." (Def's 56.1 Resp. ¶ 26.) Local Civil Rule 56.1(d) requires that "[e]ach statement by the movant or opponent [to a motion for summary judgment] . . . must be followed by citation to evidence that would be admissible." New York's citation to the Complaint is "not to admissible evidence and [is] thus improper." *Cotnoir-Debenedetto v. Uniondale Union Free Sch. Dist.*, No. 20-CV-5096, 2023 WL 4274701, at *4–5 (E.D.N.Y. June 29, 2023) (citation omitted); *see also LaFlam v. Am. Sugar Ref., Inc.*, No. 21-CV-6710, 2024 WL 149766, at *1 n.3 (S.D.N.Y. Jan. 12, 2024) ("It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment." (quoting *Caro Cap. LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023))). Accordingly, this statement, along with paragraph 27, will be deemed admitted to the extent supported by the record. *See Cotnoir-Debenedetto*, 2023 WL 4274701, at *5 (deeming statements disputed by a non-movant admitted where the non-movant cited to the complaint).

Discharge Statute.  (*See* Def's 56.1 Resp. ¶ 30.)  S5181 proposed the creation of a new ECL

section titled "Prohibition against radiological pollution," providing that "[i]t shall be unlawful

for any person or entity, directly or indirectly, to throw, drain, run or otherwise discharge any

radiological agent into the waters of the state," and set out fines for violations of the statute.

(S5181 at 4–10.)  In a memorandum in support of S5181, Senator Harckham provided the

following justification for the bill:

> The Hudson [R]iver serves as a drinking water source for over 100,000 New
> Yorkers.  The potential release of radioactive contaminants to our state's most
> influential river is an urgent matter to the residents of Peekskill and all other
> communities along the tidal estuary.  Exposure to toxic substances and radioactive
> material poses not only a possible health risk, but also a serious economic risk to
> our communities with potential negative impacts on real estate values.
> To protect the health and economic well[-]being of its residents, New York must
> take a strong stance against radiological dumping into state waters.  Existing
> regulations represent the minimum protections the state is required to provide and
> must evolve over time to be more protective.  As climate change continues to
> threaten us, our water sources will serve as a competitive edge to resiliency.  We
> must ensure they are protected and preserved.

(Pl's 56.1 ¶ 33; Catterson Decl., Ex. B (Dkt. No. 30-2).)  On March 1, 2023, Senator Harckham

issued a press release noting that the introduction of S5181 "was galvanized when plans were

announced by Holtec to release radioactive waste water from the decommissioned Indian Point

nuclear power plant into the Hudson River."  (Catterson Decl., Ex. C (Dkt. No. 30-3) at ECF 2.)

On April 25 and 27, 2023, the Indian Point Decommissioning Oversight Board held

hearings on "controlled radiological effluent discharges from Indian Point."  (Catterson Decl.,

Ex. D ("DOB Hearings Tr.") (Dkt. No. 30-4) at ECF 2.)  The Board "provides a venue for

information exchange, oversight coordination, and public engagement on all matters pertaining

to the [d]ecommissioning of Indian Point."  (*Id.* at ECF 4:18–21.)

In May 2023, Senator Harckham and New York Assembly Member Dana Levenberg

introduced S6893 and A7208, respectively.  (*See* Catterson Decl., Ex. E ("A7208") (Dkt. No. 30-

5); Catterson Decl. Ex. F ("S6893") (Dkt. No. 30-6).)  The bills are identical.  (*Compare* A7208 *with* S6893).  Senator Harckham submitted a memorandum in support of S6893 providing the following justification for the bill:

> The Hudson Rivers is a monumental piece of New York's history, character, and economic success.  In 2023, private sector jobs alone in the Hudson Valley increased by 10,500[,] or 1.4 percent, to 787,000.  Discharging radiological chemicals from nuclear power plants into our most influential water source has a multitude of adverse and substantial economic impacts on the state and its residents. Our communities along the Hudson River are concerned with the economic impacts on local real estate values and development that could arise as a result of discharging nuclear waste into the waters of the state during the decommissioning process, which is no longer balanced by any economic benefits to those communities provided during operation.

(Decl. of Philip Bein ("Bein Decl."), Ex. 1 (Dkt. No. 34-1) at ECF 2.)  Assembly Member Levenberg submitted a memorandum in support of A7208 stating that "[t]he purpose of the bill is to protect communities along the Hudson River from the adverse economic impacts resulting from the discharge of nuclear waste in to the River by decommissioning nuclear power plants" and that "[t]he discharge of nuclear waste into the Hudson River poses a substantial risk to real estate values and the economic development of those communities along the river."  (Bein Decl., Ex. 2 (Dkt. No. 34-2) at ECF 2.)  Both memoranda characterize their bills as "new" under the section titled "Prior Legislative History."  (Bein Decl., Ex. 1 at ECF 2; Bein Decl., Ex. 2 at ECF 2.)  After Senate debate on June 9, 2023, (*see* Catterson Decl., Ex. G ("Senate Debate Tr.") (Dkt. No. 30-7)), and Assembly debate on June 20, 2023, (*see* Catterson Decl., Ex. H ("Assemb. Debate Tr.") (Dkt. No. 30-8)), Governor Kathy Hochul signed the Discharge Statute into law on August 18, 2023, (Pl's 56.1 ¶ 53).

The Discharge Statute is codified at ECL Article 30 and is titled "Decommissioning Nuclear Power Plant Discharges into the Hudson River."  *See* N.Y. Env. Conserv. L. Art. 30. Section 30-0101 provides legislative findings:

> 1. The legislature finds that while the energy and economic output generated by nuclear power plants are beneficial to the state and its residents, discharges into waters of the state of radiological agents from nuclear power plants have various adverse and substantial economic impacts on the state and its residents.
> 2. The legislature further finds that communities with interests in the Hudson River are concerned with the economic impacts on local real estate values and economic development with respect to the discharge of waste from nuclear power plants into waters of the state during plant decommissioning, which effect is no longer balanced by countervailing economic benefits of the plant to those communities that the plant provided during operation.
> 3. The legislature further finds that other methods of managing waste from decommissioning nuclear power plants are available and would not result in the same economic impacts.
> 4. The legislature therefore finds and declares that it is the duty of the state to act to preserve the economic vitality of affected communities

(*Id.* § 30-0101.)  Section 30-0103 provides, in full:  "To the extent not subject to preemption by federal law, and notwithstanding any other state or local law, rule, or regulation to the contrary, it shall be unlawful to discharge any radiological substance into the Hudson River in connection with the decommissioning of a nuclear power plant."  (*Id.* § 30-0103.)

B.  Procedural Background

On April 18, 2024, Holtec initiated this Action.  (*See* Compl.)  On August 8, 2024, the Court set a briefing schedule related to the instant Motions.  (*See* Dkt. No. 27.)  On October 7, 2024, Holtec filed its Motion.  (*See* Not. of Mot. (Dkt. No. 28); Holtec's Mem. in Supp. ("Pl's Mem.") (Dkt. No. 29); Pl's 56.1.)  On November 8, 2024, New York simultaneously responded and filed its Cross-Motion.  (*See* Cross Not. of Mot. (Dkt. No. 33); New York's Mem. in Opp. ("Def's Opp.") (Dkt. No. 35); Def's 56.1 Resp.)  On November 22, 2024, Holtec filed its Reply. (Holtec's Reply Mem. in Supp. ("Pl's Reply") (Dkt. No. 37); Pl's 56.1 Resp.)  On December 6, 2024, New York filed its Reply.  (New York's Reply Mem. in Supp.  ("Def's Reply") (Dkt. No. 40).)

## II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva*

*Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

## B. Analysis[2]

Holtec argues that the Discharge Statute is preempted under field and conflict preemption and because it has a "direct and substantial effect" on a radiological safety decision. (*See* Pl's Mem. 10–20.) New York disagrees and argues that it is entitled to summary judgment because

---

[2] New York initially argued that Holtec lacks standing, (*see* Def's Opp. 6–7), but later withdrew this argument, (*see* Def's Reply 1 n.1). Because the argument is withdrawn, the Court need not address it. *See Venetsky v. United States*, No. 16-CV-8464, 2019 WL 1768967, at *9 n.15 (S.D.N.Y. Mar. 31, 2019) (finding at summary judgment that the court need not address arguments that a party withdrew in its opposition brief).

Holtec has violated the Discharge Statute by discharging radiological substances into the Hudson River.  (*See* Def's Opp. 19–20.)  The Court addresses these arguments in turn.[3]

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in pursuance thereof," are "the supreme law of the land . . ., anything in the Constitution or laws of any state to the contrary notwithstanding."  Art. VI, cl. 2.  "A corollary of the Supremacy Clause is the doctrine of preemption, under which Congress may 'exercise its constitutionally delegated authority to set aside the laws of a State.'"  *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 30 (1996)).  "Preemption is 'a matter of statutory interpretation,' and [the Court] must 'ascertain the intent of Congress.'"  *Id.* (quoting first *Cantero v. Bank of Am. N.A.*, 49 F.4th 121, 130 (2d Cir. 2022), then *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987)).  "Accordingly, '[a]s with any question of statutory interpretation,' the Court must 'begin with the text of the statute[.]'"  *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at *2 (S.D.N.Y. Mar. 18, 2025) (quoting *Catskill*

---

[3] The Court notes that neither Party addresses whether this challenge is facial or as-applied.  While the caselaw is not entirely clear on this point, the Second Circuit has indicated that a party can bring a "facial preemption challenge to state law," under which that party "must demonstrate that there is no possible set of conditions under which the challenged state [regime] could be constitutional."  *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024) (quoting *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011)); *see also Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 644 (2d Cir. 2005) ("'The facial/as-applied distinction would be relevant only if we might find some applications of the statute preempted and others not. . . . [W]here a state statute is in direct conflict' with a federal statute 'or one of its processes,' the 'focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation.'" (quoting *Chamber of Com. v. Lockyer*, 364 F.3d 1154, 1169 (9th Cir. 2004))).  Despite Holtec's request that the Court declare that the Discharge Statute is unconstitutional "as applied to Holtec," (Pl's Mem. 2), the Court finds that the challenge is facial.

*Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 512 (2d Cir.

2017)).  There are three types of preemption:

> (1) express preemption, where Congress has expressly preempted local law;
> (2) field preemption, where Congress has legislated so comprehensively that
> federal law occupies an entire field of regulation and leaves no room for state law;
> and (3) conflict preemption, where local law conflicts with federal law such that it
> is impossible for a party to comply with both or the local law is an obstacle to the
> achievement of federal objectives.  The latter two are forms of implied preemption.

*In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 377 (S.D.N.Y. 2024) (quoting

*Figueroa v. Foster*, 864 F.3d 222, 227–28 (2d Cir. 2017)), *motion to certify appeal denied*, No.

24-CV-1565, 2024 WL 4307975 (S.D.N.Y. Sept. 26, 2024).  All three types of preemption

"work in the same way:  Congress enacts a law that imposes restrictions or confers rights on

private actors; a state law confers rights or imposes restrictions that conflict with the federal law;

and therefore the federal law takes precedence and the state law is preempted."  *Murphy v. Nat'l

Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

  <u>1.  Field Preemption</u>

  The first step in "determin[ing] whether Congress has implicitly ousted the States from

regulating in a particular field . . . [is] identify[ing] the field in which this is said to have

occurred."  *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).  The Court "does not write on a blank

slate in defining the field at issue for preemption under the [AEA] because the Supreme Court

has already brought its contours into focus," although "the Supreme Court's view of field

preemption with respect to the nuclear industry has shifted over time."  *Williams v. BHI Energy I

Power Servs., LLC*, No. 21-CV-1186, 2023 WL 5403796, at *5 (D. Minn. Aug. 24, 2023),

*motion to certify appeal denied*, No. 21-CV-1186, 2024 WL 986678 (D. Minn. Mar. 7, 2024).

  There are four Supreme Court decisions that are relevant here.  The Supreme Court first

encountered the question of field preemption as it relates to the nuclear industry in *Pacific Gas &*

11

*Energy Company v. State Energy Resources Conservation & Development Commission*, 461

U.S. 190 (1983).  The case concerned a California law that "impose[d] a moratorium on the

certification of new nuclear plants" that was contingent upon a state agency's approval of nuclear

waste storage plans.  *Id.* at 198.  The Supreme Court stated that "the federal government has

occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to

the states," *id.* at 212, and upheld the statute because the rationale for enacting the California law

was an "economic purpose," placing it "outside the occupied field of nuclear safety regulation,"

*id.* at 216.

The next year the Supreme Court heard *Silkwood v. Kerr-McGee Corporation*, 464 U.S.

238 (1984), which addressed whether a state-law award of punitive damages against the operator

of a nuclear facility was preempted, *id.* at 244–46.  The defendant-appellee argued that *Pacific

Gas* was dispositive of the case and that "because the state-authorized award of punitive damages

in this case punishes and deters conduct related to radiation hazard, it falls within the prohibited

field."  *Id.* at 249.  The Supreme Court rejected that argument, noting "that the preempted field

does not extend [that] far," *id.*, and held that the award was not preempted because "Congress

assumed that state-law remedies, in whatever form they might take, were available to those

injured by nuclear incidents." *Id.*  The Supreme Court reached this holding despite the "tension

between the conclusion that safety regulation is the exclusive concern of the federal law and the

conclusion that a state may nevertheless award damages based on its own law of liability."  *Id.* at

256.

Four years later, the Supreme Court again addressed the issue in *English v. General

Electric Company*, 496 U.S. 72 (1990), which concerned whether a state-law cause of action for

intentional infliction of emotional distress and retaliation related to an employee's complaints

about nuclear safety were preempted, *id.* at 74–78.  The Supreme Court walked back *Pacific Gas*

and *Silkwood*'s emphasis on safety motivations and focused instead on whether the claim "is so

related to the 'radiological safety aspects involved in the . . . operation of a nuclear [facility] that

it falls within the pre-empted field." *Id.* at 85 (citation and quotation marks omitted).  The

Supreme Court held that "for a state law to fall within the pre-empted zone, it must have some

direct and substantial effect on the decisions made by those who build and operate nuclear

facilities concerning radiological safety levels." *Id.*  The *English* Court clarified that, "even as

[*Pacific Gas*] suggested that part of the pre-empted field is defined by reference to the purpose of

the state law in question, it made clear that another part of the field is defined by the state law's

actual effect on nuclear safety." *Id.* at 84.

      In 2019, the Supreme Court revisited nuclear field preemption in *Virginia Uranium, Inc.*

*v. Warren*, 587 U.S. 761 (2019), which addressed whether a Virginia law banning uranium

mining was preempted, *id.* at 765.  Justice Gorsuch, writing for a plurality in the lead opinion,

"tried to modernize and make sense of the Court's precedents in *Pacific Gas*, *Silkwood*, and

*English*." *Williams*, 2023 WL 5403796, at \*7.  The lead opinion and the concurrence, written by

Justice Ginsburg, both agreed that the Virginia law was not preempted because it did not

encroach on the relevant field, which is defined as the core activities set forth in 42 U.S.C.

§ 2021(c) ("Section 2021(c)"), excepting regulation of activities "for purposes other than

protection against radiation hazards," as provided by 42 U.S.C. § 2021(k) ("Section 2021(k)").

*See Va. Uranium*, 587 U.S. at 771–72 (Gorsuch, J., lead opinion); *id.* at 787–89 (Ginsburg, J.,

concurring).  The core activities as laid out in Section 2021(c) are:

      (1) the construction and operation of any production or utilization facility or any
      uranium enrichment facility;
      (2) the export from or import into the United States of byproduct, source, or special
      nuclear material, or of any production or utilization facility;

(3) the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the [NRC];
(4) the disposal of such other byproduct, source, or special nuclear material as the [NRC] determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC].

42 U.S.C. § 2021(c). Section 2021(k) states that: "Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." *Id.* § 2021(k). In an attempt to synthesize the holding of *Pacific Gas*, both opinions suggested that an inquiry into legislative history to discern the purpose for which a state law was enacted is permissible when the state law intrudes on the federal government's Section 2021(c) core activities. *See Va. Uranium*, 587 U.S. at 772 (Gorsuch, J., lead opinion) (stating that "subsection (k) does not authorize any judicial inquiry into state legislative purpose" where "the activity [the state's] law regulates . . . isn't one the AEA has ever addressed[] and . . . isn't one [Section] 2021 discusses"); *id.* at 789 (Ginsburg, J., concurring) (stating that inquiry into "whether the state law was enacted . . . for purposes other than protection against radiation hazards" is "unsurprising" where the state law "address[es] . . . an activity closely regulated by the Federal Government for nuclear safety purposes" (quotation marks and citation omitted)).

The lead opinion and the concurrence in *Virginia Uranium* did not directly address *English*'s holding that, "for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *English*, 496 U.S. at 85. The absence of an express overruling of *English* and the fact that the lead opinion and the concurrence "cited [*English*] with approval" suggest that *English*'s test is not retroactive. *See Williams*, 2023 WL 5403796, at *7 (concluding that the court "is still bound by the test announced in *English*, even if it may fall secondary to the core activities test announced in *Virginia Uranium*"). Accordingly,

the Court agrees with the analysis in *Williams* and adopts its two-part test for preemption of state laws in the nuclear safety field under the AEA:

> First, if a state law regulates a core activity described in 42 U.S.C. § 2021(c), the state law is preempted only if it was enacted for the purpose of addressing nuclear safety. [*Va. Uranium*, 587 U.S. at 769–73 (Gorsuch, J., lead opinion).] If it was enacted "for purposes other than protection against radiation hazards," 42 U.S.C. § 2021(k), it is not preempted. Second, regardless of whether the state law regulates a core activity, it can still be preempted if it has a "direct and substantial effect" on the radiological safety decisions of those who construct or operate nuclear facilities. [*English*, 496 U.S. at 85.]

*Id.* at *8; *see also Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1347 (Fed. Cir. 2012) ("Under the Supreme Court's test, a state law related to nuclear power is preempted if it: (1) is motivated by safety concerns or (2) 'ha[s] some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels[.]' (citations omitted)); *Pennsylvania v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564, 586 (M.D. Pa. 2010) ("[T]he question in this case is whether the state claims . . . involve nuclear safety concerns, if so they are preempted. If they do not, then the court must determine whether they bear a direct and substantial effect on the decisions made by those who run nuclear facilities and/or whether there are irreconcilable conflicts between them and the AEA.").

### a.  Core Activity

Holtec argues that the Discharge Statute implicates subsections (1), (3), and (4) of Section 2021(c). (*See* Pl's Mem. 11; Pl's Reply 13.) New York argues that subsection (1) does not apply because construction of Indian Point is complete and the facility is no longer in operation, (Def's Opp. 17), that subsection (3) does not apply because the Hudson River is not an "ocean or sea," (Def's Reply 4), and that subsection (4) does not apply because the discharges at issue here "do not exceed regulatory limits for radiological exposure" as laid out in NRC

regulations, and therefore are not "hazards or potential hazards," (*id.*).  Neither Party addresses subsection (2).

Subsection (1) provides that "the construction and operation of any production or utilization facility or any uranium enrichment facility" is a core activity.  42 U.S.C. § 2021(c)(1).  Holtec does not respond to New York's argument that subsection (1) does not apply because decommissioning is not a component of "construction and operation."  (*See generally* Pl's Mem.; Pl's Reply.)  Accordingly, the Court considers the argument abandoned.  *See Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *14 (S.D.N.Y. Sept. 29, 2023) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim." (quoting *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020))).[4]

As for subsection (3), it provides that "the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the [NRC]" is a core activity.  42 U.S.C. § 2021(c)(3).  Subsection (3) clearly does not apply to the Discharge Statute.  The term "ocean" generally refers to "five oceans:  Atlantic, Pacific, Indian, Arctic, and

---

[4] The Court notes that New York fails to cite any law in support of the contention that the AEA and NRC regulations do not apply to Holtec because they apply only to operating facilities.  (*See* Def's Opp. 17 n.1.)  The Court has not found any support for New York's assertion.  On the contrary, "it [is] inconsequential to the pre-emption analysis whether the nuclear facility is operational or decommissioned.  The presence of radiation hazards is sufficient to give rise to the NRC's exclusive jurisdiction."  *Missouri v. Westinghouse Elec., LLC*, 487 F. Supp. 2d 1076, 1087 (E.D. Mo. 2007).  This is unsurprising given that the management of radioactive waste outlives the operation of a nuclear energy facility.  *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 692 (2025) (Gorsuch, J., dissenting) ("Spent nuclear fuel is radioactive, explosive, and highly volatile, and it can remain so for thousands of years." (citation and quotation marks omitted)); *What's the Lifespan for a Nuclear Reactor?  Much Longer Than You Might Think*, U.S. DEP'T OF ENERGY (Apr. 16, 2020), https://www.energy.gov/ne/articles/whats-lifespan-nuclear-reactor-much-longer-you-might-think [https://perma.cc/CW2U-AZH7] (indicating that approximately 20% of the nation's nuclear energy facilities "plan[] or intend[] to operate up to 80 years.").

Antarctic." *Ocean*, Black's Law Dictionary (12th ed. 2024). As for "sea," the term can be used interchangeably with "ocean" and can also refer to "[a] large landlocked part of the ocean" or "a large body of salt water smaller than a regular ocean." *Sea*, Black's Law Dictionary (12th ed. 2024). In contrast, the Hudson River "is a tidal estuary with a 'salt front' of water moving upstream and down." *Hudson River Fishermen's Ass'n v. City of New York*, 751 F. Supp. 1088, 1094 (S.D.N.Y. 1990), *aff'd,* 940 F.2d 649 (2d Cir. 1991). A resident of the Southern District of New York need look southeast, not west to the Hudson, to catch a glimpse of a body of water that could be called an ocean or sea.[5]

Subsection (4) provides that "the disposal of such other byproduct, source, or special nuclear material as the [NRC] determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC]" is a core activity of the NRC. 42 U.S.C. § 2021(c)(4). New York argues that, because the tritiated water contains one-thousandth the regulatory limit as set by the NRC, it is not a "hazard[] or potential hazard[]" under this subsection. (Def's Reply 4.) This argument fails to hold water as it is contrary to the plain meaning of the statute. Section 2021(c)(4) is not limited, as New York suggests, only to "disposals that would exceed NRC regulatory limits." (*Id.* (emphasis omitted).) Rather, the clause "because of the hazards or potential hazards thereof" merely clarifies that the provision applies to "byproduct, source, or special nuclear material," the disposal of which requires an NRC license. Federal regulations promulgated pursuant to the AEA "establish standards for protection against ionizing radiation resulting from activities conducted under

---

[5] Neither Party discusses whether disposal of byproduct into a river that empties into an ocean or sea comes within the ambit of subsection (3). Because the Parties are silent on the matter and because the plain language of subsection (3) does not contemplate bodies of water other than oceans and seas, the Court does not investigate further.

licenses issued by the [NRC]" and "control the . . . disposal of licensed materials by any licensee

. . . ." 10 C.F.R. § 20.1001.  The Parties do not dispute that Indian Point and Holtec are subject

to these regulations.  (*See* Pl's 56.1 ¶ 15; *see also* Decl. of Frank Spagnuolo ("Spagnuolo

Decl."), Ex. B (Dkt. No. 31-2) at ECF 12 (indicating the license for Indian Point 1 is subject to

10 C.F.R. Part 20); Spagnuolo Decl., Ex. C (Dkt. No. 31-3) at ECF 8 (same for Indian Point 2);

Spagnuolo Decl., Ex. D (Dkt. No. 31-4) at ECF 7 (same for Indian Point 3).)[6]  The Discharge

Statute prohibits the discharge of "any radiological substance into the Hudson River . . . ."  ECL

§ 30-0103.  The Court finds that the Discharge Statute and Section 2021(c)(4) overlap such that

the state law treads on a core activity described in 42 U.S.C. § 2021(c).  Accordingly, the Court

turns to an inquiry into the state's purpose in enacting the Discharge Statute.  *Cf. Va. Uranium*,

587 U.S. at 772 (Gorsuch, J., lead opinion) (holding that "subsection (k) does not authorize any

judicial inquiry into legislative purpose" where "the activity [the state's] law regulates . . . isn't

one the AEA has ever addressed[] and it isn't one [Section] 2021 discusses"); *see id.* at 788–89

(Ginsburg. J., concurring) (noting that "it may sometimes be appropriate to inquire into the

---

[6] New York attempts to dispute this fact, saying simply:  "Disputed.  Plaintiffs and IPEC are also subject to the provisions of [the Discharge Statute]."  (Def's 56.1 Resp. ¶ 15.)  New York's response fails to actually dispute the proffered fact, which is that Holtec and Indian Point are subject to regulations provided in 10 C.F.R. Part 20.  (*See* Pl's 56.1 ¶ 15.)  Asserting that Holtec is "also subject" to the Statute comes nowhere close to disputing that 10 C.F.R. Part 20 applies to Holtec.  Because New York fails to specifically controvert this fact, the Court will deem it admitted because it is supported by record evidence.  *See Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at *1 (S.D.N.Y. Nov. 18, 2024) (deeming admitted facts that a non-movant failed to specifically controvert); *cf. Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023) (deeming facts to which defendant asserted general denials admitted once the Court "scrutinize[d] [p]laintiff's submitted evidence to determine whether the evidence supports [p]laintiff's statements.").

purpose for which a state law was enacted" where the state law addresses "an activity closely regulated by the Federal Government for nuclear safety purposes.").

New York argues that the Discharge Statute was enacted "out of economic concerns" and highlights that the law includes "no findings about the radiological safety of the prohibited discharges." (Def's Opp. 9.) It is true that the Discharge Statute's legislative findings reference economic motivations and do not mention safety concerns. *See* N.Y. Env. Conserv. L. § 30-0101. That, however, is not the end of the matter, because the Second Circuit has noted that

> [courts] do not blindly accept the articulated purpose of [a state statute] for preemption purposes. If that were the rule, legislatures could "nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law."

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 416 (2d Cir. 2013) (quoting *Greater N.Y. Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 108 (2d Cir. 1999), *abrogated on other grounds by Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001)). Indeed, Holtec draws upon the Discharge Statute's alleged legislative history to argue that New York's *actual* purpose is concern about nuclear safety and that the economic justification is mere pretext. (Pl's Mem. 17–20.) New York responds that the Statute's stated purpose is the only purpose the Court can and should consider and that "the Supreme Court has twice expressed disapproval of inquiring too deeply into legislative motives." (Def's Opp. 11–14.) The Court recognizes that it should not "too hastily accept[] [Holtec's] invitation to become embroiled in attempting to ascertain state legislative motives[.]" *Va. Uranium*, 587 U.S. at 777 (citation and quotation marks omitted) (alterations adopted). However, such an inquiry is warranted here because the Discharge Statute on its face "trench[es] on core federal powers reserved to the federal government by the AEA." *Id.* at 773.

19

"The hierarchy of legislative history values committee reports over floor statements, and floor statements by key legislative drafters and sponsors over floor statements of other members of [the legislature]." *Saunders v. City of New York*, 594 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) (citing *Garcia v. United States*, 469 U.S. 70, 76 (1984), and *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989)); *Shapiro v. Peacock TV*, No. 23-CV-6345, 2025 WL 968519, at \*9 n.6 (S.D.N.Y. Mar. 31, 2025) ("The most enlightening source of legislative history is generally a committee report . . . ." (quoting *Chai v. Comm'r of Internal Revenue*, 851 F.3d 190, 219 (2d Cir. 2017))). "[E]xcerpts from committee hearings and scattered floor statements by individual lawmakers" are "among the least illuminating forms of legislative history." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017) (citation and quotation marks omitted).

Here, there is no committee report. The legislative history comprises floor statements by Senator Harckham and Assembly Member Levenberg and debate in the Senate and Assembly. Holtec starts with S5181, a bill introduced by Senator Harckham that it argues "ultimately became" the Discharge Statute—a fact that New York disputes. (*See* Pl's Mem. 6; Def's 56.1 Resp. ¶ 30.) S5181 prohibits "any person or entity, directly or indirectly, to throw, drain, run or otherwise discharge any radiological agent into the waters of the state." (S5181.) The Court declines to follow Holtec down the inferential rabbit hole. The Supreme Court has cautioned against reading too deeply into a legislature's consideration and rejection of a provision that resembles a later-enacted law, as "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' [legislature]." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)); *see also id.* ("It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law."); *Bostock v. Clayton Cnty.*, 590

20

U.S. 644, 670 (2020) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote." (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring))); *New York v. Dep't of Just.*, 951 F.3d 84, 110 (2d Cir. 2020) (noting that "several equally untenable inferences may be drawn from [legislative] inaction" (quotation marks omitted) (quoting *LTV Corp.*, 496 U.S. at 659)). The analysis in *Pacific Gas* is on point; there, the plaintiff argued that an initiative, from which the law at issue arose, and companion provisions in California's nuclear laws were "more clearly written with safety purposes in mind" and that this "common heritage" should have tainted the law at issue. 461 U.S. at 215. The Supreme Court summarily rejected this argument, noting that "[t]he short answer . . . is that these other state laws are not before the [Supreme] Court[] and . . . [the proposition] was not passed," thereby limiting their impact on the Supreme Court's analysis. *Id.* at 216.

Holtec argues that the legislative history indicates that the Discharge Statute was "grounded in [radiological] safety concerns." (Pl's Mem. 17 (quoting *Entergy Nuclear*, 733 F.3d at 422).)[7] The Court notes that, at first glance, there is some tension in the Second Circuit's 2013

---

[7] Holtec also points to transcripts of meetings held by the Indian Point Decommissioning Oversight Board. (*See* DOB Hearings Tr.) These meetings "garner[ed] input from members of the public on controlled radiological effluent discharges from Indian Point," (*id.* at ECF 2), and included discussion by panelists, including representatives from the NRC, the Environmental Protection Agency, and Holtec, an independent technical expert, Senator Harckham, and Assembly Member Levenberg, (*see generally id.* at ECF 212–411).

The transcripts are of limited persuasiveness when it comes to the Court's legislative history inquiry, as the Supreme Court has warned that such materials are "among the least illuminating forms of legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (quoting *Advoc. Health Care Network*, 581 U.S. 468, 481 (2017)). In any case, the Court has reviewed the transcripts and found the comments by the Statute's sponsors, Senator Harckham and Assembly Member Levenberg, to be consistent with their statements during the Senate and Assembly debate, respectively. To that end, the meeting transcripts simply bolster those more reliable materials. *Cf. id.* (noting that the reliability of committee

holding in *Entergy Nuclear* and the Supreme Court's 2019 decision in *Virginia Uranium*.

Indeed, *Entergy Nuclear* could be read, as it appears Holtec does, to support the proposition that

a court can and should dive into legislative history and scrutinize proffered legislative

motivations to see if they, at their very core, rely more on nuclear safety than some other

permissible non-safety rationale.  But it is worth noting that in *Entergy Nuclear* both the district

court and Second Circuit found the legislature had been "remarkabl[y] consisten[t]" in

"express[ing] concern about radiological safety and . . . a *desire to evade federal preemption*."

*Entergy Nuclear*, 733 F.3d at 420 (emphasis added); *see also id.* ("Okay, let's find another word

for safety[.]"); *id.* at 421 ("I understand that only the feds are allowed to think of safety issues,

and we carefully don't use that word here.").  The Second Circuit noted that these and other

comments were "not merely isolated comments by a few legislators, but rather part of a

consistent effort by those responsible for drafting and passing [the state law at issue] to obfuscate

the record through the use of misleading statements that they thought would pass muster under

*Pacific Gas*."  *Id.* at 421.  Further, while the lead opinion in *Virginia Uranium* lays out the

"conceptual and practical" concerns with "potential misadventures into hidden state legislative

intentions," *Va. Uranium*, 587 U.S. at 776 (Gorsuch, J., lead opinion), the concurrence

specifically disclaims this language, *see id.* at 781 (Ginsburg, J., concurring).  As such, the Court

takes the narrowest holding it can extract from *Virginia Uranium*—that inquiry into legislative

history may be warranted when a state law encroaches on a Section 2021(c) core activity.  *See*

supra Section II.B.1; *cf. United States v. Mackey*, 652 F. Supp. 3d 309, 342 (E.D.N.Y. 2023)

---

hearing excerpts are particularly suspect when they "do not comport" with more reliable sources
of legislative history like "official committee reports that are consistent with the plain and
ordinary meaning of the statute's terms.").

("Where . . . 'a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the [Supreme] Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977))).  That being said, the Court agrees that "piling inference upon inference about hidden legislative wishes . . . risk[s] displacing the legislative compromises actually reflected in the statutory text[.]"  *Va. Uranium*, 587 U.S. at 778 (Gorsuch, J., lead opinion).

Holtec argues that Senator Harckham and Assembly Member Levenberg's comments "demonstrate that the true motivations for the law were radiological safety concerns and the potential for speculative downstream economic impacts arising from those concerns."  (Pl's Mem. 19.)  Holtec relies heavily on *Entergy Nuclear*, in which the Second Circuit affirmed the district court's finding that "legislators' concerns regarding the radiological safety of Vermont Yankee were a primary motivating force for [the statute at issue]."  *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 838 F. Supp. 2d 183, 229 (D. Vt. 2012), *aff'd in part, rev'd in part*, 733 F.3d 393 (2d Cir. 2013).  The district court noted "numerous references to safety [that] reflect[ed] legislators' responsible recognition that Vermont is preempted from regulating radiological health and safety and indicate their desire to avoid invalidating their work on that ground."  *Id.*

Senator Harckham explicitly acknowledged that, "when it comes to the health impacts, yes, the federal government does have preemption," but stated that the "premise" of the Statute was based on Section 2021(k) and the Supreme Court's decision in *Pacific Gas*.  (Senate Debate Tr. at 6792:10–6793:4; *see also* Assemb. Debate Tr. at 169 (in response to a question about federal preemption, Assembly Member Levenberg explained that the Statute "specifically has to

do with the economic impacts of the discharge" and asserted that "the Supreme Court agreed with the [Ninth] Circuit that the State has the ability to regulate if it would have a negative impact on the economy").)  Here, the New York legislature was attempting to thread a needle it believed was created by *Pacific Gas*.  It was not, like the legislature in *Entergy Nuclear*, masking its true concern in radiological safety with other non-safety reasons, such as the state's need for power and the economic impact of long-term nuclear waste storage.  *See Entergy Nuclear*, 838 F. Supp. 2d at 228–29.  For this reason, *Entergy Nuclear* does not compel a finding of preemption.

Undaunted, Holtec also argues that the Statute fails because "every reference to economic concerns in the Senate and Assembly debates links those concerns to fears arising from perceived safety risks."  (Pl's Mem. 18.)  But both sponsors stated multiple times, in different ways, that the Statute was primarily motivated by economic impact.  (*See* Senate Debate Tr. at 6785:7–10 (describing the Statute as "not about the health and it's not about the [radiological] levels.  It's about the economic impact that the communities fear this will have"); *id.* at 6789:16–21 (noting that members of the public were concerned about "a safe level of tritium exposure" but stating that "[t]hat's not what this bill is about.  It's about the economic vitality"); *id.* at 6790:13–17 (stating that the bill is "trying to . . . prevent economic harm to the Lower Hudson Valley"); Assemb. Debate Tr. at 130 ("[T]he purpose of this bill is to help prevent adverse impacts including decreased real property values for the Hudson River communities in relation to the dumping of radioactive waste into the Hudson.").)  The sponsors did acknowledge that the economic impact motivation is closely related to concern about nuclear safety.  (*See* Senate Debate Tr. at 6786:20–23 ("[A]ll of a sudden the community hears that 1.5 million gallons of tritiated water are going to be released, it causes panic.  And that's the fear that folks have."); Assemb. Debate Tr. at 136 (stating that "the psychological impact on the public knowing that

24

there's been radiological discharge into the Hudson would dampen tourism . . . [and] property values"); *id.* at 154 (noting that "economic impacts to the Hudson River Valley . . . is something that is intrinsically impacted by public perception"); *id.* at 170 ("We're dealing with the economic impact, and that is a combination of public perception and what that has to do with environmental or health impacts.  So even though this bill doesn't discuss environmental health impacts, the public perception is tied to what they believe . . . could actually happen to them if they were to swim, boat, paddle or live on and dip their toes into the Hudson River."); *id.* at 182 ("Public perception of a polluted, hazardous river will undermine our local economy in various ways, harming property values, business interests and much more.").)  But such acknowledgment does not poison their motivations, and the Court declines to divine the primacy of permissible versus impermissible motivations through an even more searching analysis of the legislative history.

While this is a close call, the Court finds that it cannot conclude on this record that the New York Legislature acted with "an impermissible primary purpose."  *Entergy Nuclear*, 733 F.3d at 421.  Next, the Court must determine whether the Discharge Statute is preempted under the test set forth in *English*.

### b.  Direct and Substantial Effect

Holtec argues that the Discharge Statute is preempted because it requires Holtec "find an alternative method by which to dispose of tritiated water," which is "a direct and substantial effect on Holtec's decision on how to safely dispose of radioactive materials."  (Pl's Mem. 14–15.)

As mentioned above, "regardless of whether the state law regulates a core activity, it can still be preempted if it has a 'direct and substantial effect' on the radiological safety decisions of

those who construct or operate nuclear facilities." *Williams*, 2023 WL 5403796, at *8 (quoting *English*, 496 U.S. at 85). In the nuclear context, courts have found a range of state laws preempted for having such an effect. For example, *Cox v. Duke Energy Inc.*, 876 F.3d 625 (4th Cir. 2017), concerns a plaintiff who flew a glider close to defendant's nuclear facility, prompting the defendant to contact law enforcement, which resulted in plaintiff's arrest, *id.* at 629. The plaintiff asserted that the defendant's "negligent reporting" about his glider activity "was the but-for cause of his false arrest and imprisonment." *Id.* at 635–36. The district court held and the Fourth Circuit affirmed that "[the defendant's] conduct, even if tortious, was responsive to the safety concerns governed exclusively by federal law and imposing liability based on such claims would have a 'direct and substantial effect' on decisions designed to ensure the facility's safety." *Id.* at 636 (citations omitted). Indeed, "the entire incident implicated the very nuclear safety concerns at the core of the field preempted by federal law." *Id. Boldt v. Northern States Power Company*, 195 F. Supp. 3d 1057 (D. Minn. 2016), concerns a plaintiff who sued the defendant nuclear facility operator alleging disability discrimination under the state law based on a perceived disability of alcoholism, *see id.* at 1058. The state law "forb[ade] an employer from discriminating against a person with respect to the conditions or privileges of employment because of a disability except when based on a bona fide occupational qualification." *Id.* at 1063. Under relevant NRC regulations, the defendant had a duty "to provide reasonable assurances that individuals who are granted unescorted access to nuclear power plant protected areas are trustworthy and reliable as demonstrated by the avoidance of substance abuse." *Id.* (alteration adopted) (citation and quotation marks omitted). The court found the state law preempted because it had a direct and substantial effect on decisions made by the defendant in that it forced the defendant to decide between facing liability under the state law or "allowing an

employee who [they] regard[ed] as having a substance abuse problem to continue to have condition-free unescorted access to protected areas of [the] nuclear power plant." *Id.  United States v. Manning*, 527 F.3d 828 (9th Cir. 2008), concerns the impact of a Washington law that regulated "materials that are variously described as hazardous, dangerous, radioactive, or having some combination of these attributes," on a facility operated by the U.S. Department of Energy ("DOE") that housed radioactive waste. *Id.* at 831, 833 (citation omitted).  The district court found that the state law had eight potential direct and substantial effects on DOE.  *See United States v. Manning*, 434 F. Supp. 2d 988, 1006 (E.D. Wash. 2006), *aff'd*, 527 F.3d 828 (9th Cir. 2008).  The district court also found that "[f]orcing plaintiffs to speculate how the [state law] might be applied by [Washington] . . . [is] enough in [itself] to directly and substantial affect plaintiffs' decisions about AEA materials." *Id.* at 1007.  The Ninth Circuit affirmed that the state law was preempted "because it directly and substantially impact[ed] the DOE's decisions on the nationwide management of nuclear waste." *Manning*, 527 F.3d at 839.  The Ninth Circuit also noted the direct and substantial effect that "[l]egislation geared to effectively close [the facility at issue] for an extended period of time" had on "the DOE's ability to make decisions regarding if and when it will ship additional waste to [that facility]." *Id.* at 840.

A state law that deters an AEA core activity can also be deemed to have a direct and substantial impact.  In *Vermont Yankee Nuclear*, the Federal Circuit reasoned that a state law requiring a nuclear facility operator pay significant monies into a Clean Energy Development Fund "as a condition of constructing a dry storage facility[] could easily deter a utility from constructing such a facility whose construction is encouraged if not mandated by federal law." 683 F.3d at 1347.  In other words, the court found that "the requirement to pay money into the

Clean Energy Development Fund could have a 'direct and substantial effect' on decisions concerning radiological safety." *Id.* at 1348.

Holtec asserts that "the Discharge [Statute] prohibits Holtec from discharging any radiological substances connected with decommissioning into the Hudson River." (Pl's 56.1 ¶ 57.) New York disputes this and states: "Disputed. There are other alternatives for disposition of tritiated wastewater from Indian Point which may also comply with federal law." (Def's 56.1 Resp. ¶ 57.) This does not actually controvert Holtec's asserted fact. That there are alternative means of disposal does not address whether the Discharge Statute prohibits Holtec from discharging tritiated water into the Hudson River. Accordingly, this fact is deemed admitted. *See Mae*, 2023 WL 6162927, at *1 n.2. Holtec also asserts that the Statute "will force Holtec to seek an alternative with differing radiological impacts from discharging into the Hudson River." (Pl's 56.1 ¶ 58.) New York disputes this too, stating: "Disputed. All of the alternatives are safe with no substantial safety risk because the concentration of radiological substances in the wastewater is 1000 times lower than the public safety exposure limits of 25 [millirems]." (Def's 56.1 Resp. ¶ 58.) In support, New York cites page 36 of Holtec's 2023 Annual Radioactive Effluent Release Report. (Spagnuolo Decl., Ex. E (Dkt. No. 31-5) at 36.) Page 36 contains a table, reproduced below, that shows the maximum radiation doses that are permitted to an individual's body, thyroid, and organs and Indian Point's 2023 actual dose assessments for routine airborne effluents, routine liquid effluents, and other pathways. (*Id.* 36.)

Table  6-1 Summation of Dose Assessments

| Year:  2023 | | Total Body | Thyroid | Max Organ |
|---|---|---|---|---|
| 40 CFR 190 limit ===➔ | IPEC | 25 mrem | 75 mrem | 25 mrem |
| Routine Airborne Effluents[1] | Units 1 and 2 | 1.69E-04 | 1.69E-04 | 1.69E-04 |
| Routine Liquid Effluents | Units 1 and 2 | 2.46E-02 | 8.67E-06 | 4.10E-02 |
| Routine Airborne Effluents[1] | Unit 3 | 1.76E-03 | 1.76E-03 | 1.76E-03 |
| Routine Liquid Effluents | Unit 3 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| Ground Water & Storm Drain Totals | IPEC[2] | 8.48E-05 | 2.00E-07 | 3.45E-04 |
| Direct Shine from areas such as dry cask storage, radwaste storage, SG Mausoleum, etc. | IPEC[3] | 4.90E-01 | 4.90E-01 | 4.90E-01 |
| Indian Point Energy Center Total Dose, per 40 CFR 190 | IPEC | 5.17E-01 | 4.92E-01 | 5.33E-01 |

This table of assessed doses for Indian Point during 2023 cannot possibly support the assertion that "[a]ll alternatives [to discharge via the Hudson River] are safe with no substantial safety risk."  (Def's 56.1 Resp. ¶ 58.)  How does a table of assessed doses resulting from effluents establish that other alternatives, including mixing tritiated water with clay and transporting the mixture via truck or train, or storing the water in tanks that must be vented, or allowing the water to evaporate, (*see* Pl's 56.1 ¶¶ 48–50 (providing examples of alternative disposal methods discussed by Senator Harckham that are undisputed)), are safe?  The simple answer is it does not. The fact remains that the Discharge Statute "categorically preclude[s] [Holtec] from utilizing a federally accepted method of disposal."  (Pl's Reply 10.)  By requiring Holtec to change the method by which it disposes of tritiated water, the Statute directly and substantially effects decisions concerning radiological safety levels.[8]  At bottom, the Statute has the effect of

---

[8] New York also asserts that Holtec is required to adduce, but has not, "[any] evidence that its disposal decision has any effect on or nexus to radiological safety."  (Def's Reply 5.) This argument is baffling.  Can New York's argument really be that Holtec has failed to demonstrate that its decision to dispose of water irradiated by proximity to nuclear fission and containing a "radioactive isotope of hydrogen that cannot practically be removed," (Pl's 56.1 ¶ 25), is one that concerns radiological safety?  In any case, New York does not dispute that the tritiated water is radioactive and that tritiated water has been discharged from Indian Point into

"trumping [NRC] decision-making with respect to the . . . disposal of AEA radionucilides," thereby representing a direct and substantial effect that warrants preemption.  *Manning*, 527 F.3d at 840 n.10.

New York makes a number of arguments to the contrary.  None is availing.  New York first argues that Holtec "has not met its burden to plead or show that the [Statute] will have a substantial effect on nuclear safety."  (Def's Opp. 18.)  But this is not the test.  The substantial effect is not on nuclear safety, but on "decisions . . . concerning radiological safety levels." *English*, 496 U.S. at 85.  In effect, New York argues that if an entity regulated and licensed by the NRC is in compliance with regulations as they pertain to nuclear safety, only state laws that would require the entity to violate those regulations could be subject to preemption.  New York makes this argument in relation to Holtec's field preemption argument, *see* infra n.8, but it sounds in conflict preemption, which the Court does not reach.

New York also argues that Holtec "has not alleged or shown that there is an absence of alternatives to [complying with the Discharge Statute]," or that "any [other] option for disposing of Indian Point's effluent would exceed the 25 millirem safety limit or is otherwise unsafe." (Def's Opp. 18.)  But Holtec need not show an absence of alternatives; rather, it must show that the Discharge Statute impacts decisions concerning radiological safety levels, which it has done. (*See* Pl's 56.1 ¶¶ 57–58.)  *Cf. Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223,

---

the Hudson River.  (Def's 56.1 Resp. ¶¶ 25, 28; Def's 56.1 ¶ 9 (asserting that the discharge of tritiated water, i.e., "Indian Point effluent" causes "de minimis" "radiological exposure").) Finally, New York even acknowledges that disposal decisions implicate public health and safety. (*See* Def's 56.1 Resp. ¶ 59 (Holtec asserts that disposal alternatives "may be less protective of public health and safety than the discharge of the tritiated water to the Hudson River," and New York disputes this, stating in response:  "All of the alternatives are full protective of public health and safety . . . .").)  In short, Holtec has made a sufficient showing that its disposal decision has a direct effect on radiological safety.

1246 (10th Cir. 2004) (rejecting defendant's argument that "*Pacific Gas*, *Silkwood*, and *English* . . . turn the preemption inquiry upon a precise determination of costs imposed upon the operators of nuclear facilities by the application of the state law."). Rather, it is enough that foreclosing disposal of tritiated water via the Hudson River requires Holtec to investigate alternative methods of disposal, choose one, ensure compliance with NRC regulations, and then execute on its choice. The chain of events that the Discharge Statute necessarily sets off clearly has a direct and substantial effect on those operating nuclear facilities.[9] Accordingly, the Court finds that the Discharge Statute is preempted.

2. New York's Counterclaim

New York cross-moved for summary judgment on Holtec's liability under the Discharge Statute and for declaratory judgment that Holtec has violated the Statute. (*See* Cross Not. of Mot. 2.) The Court has found the Discharge Statute preempted. *See supra* Section II.B.1.b. "Under the doctrine of federal preemption, 'state and local laws that conflict with federal law are without effect.'" *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024) (quoting *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010)). Given that the Discharge Statute is without effect, the Court denies New York's Cross-Motion. *See Williams v. Murphy*, No. 13-CV-1154, 2018 WL 2016850, at *17 (D. Conn. Mar. 29, 2018) (finding that its grant of summary judgment on the ground of preemption was "dispositive" of other pending motions, which the court denied as moot), *aff'd sub nom. Williams v. Marinelli*, 987 F.3d 188 (2d Cir. 2021).

---

[9] Because the Court finds that the Discharge Statute is field preempted, it does not reach the Parties' arguments as they relate to conflict preemption.

III.  Conclusion

For the reasons set forth above, Holtec's Motion is granted and New York's Cross-Motion is denied.  The Clerk of the Court is respectfully directed to terminate the pending motion flags at Dkt. Nos. 28 and 33.  The Court will hold a conference on October 9, 2025, at 3:00 PM.  Dial-in information can be found in the Court's Individual Rules.

SO ORDERED.

Dated:    September 24, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge